UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————

| | |
|---|---|
| VALERIE KLINE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 10-1802 (RCL) |
| | ) |
| KATHERINE ARCHULETA, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

———————————————————

### MEMORANDUM OPINION

In this suit, Ms. Valerie Kline, pro se, claims her employers at the U.S. Office of Personnel Management retaliated against her for filing EEOC complaints by "stripping her of her professional duties." Pl.'s Second Am. Compl. ¶ 94. She brings this suit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C.S. § 1981.

Before the Court are plaintiff's Motion [ECF No. 124] for Partial Summary Judgment, defendant's Opposition [ECF No. 133], and plaintiff's reply [ECF No. 139]. Also before the Court are defendant's Motion [ECF No. 132] to Dismiss or in the Alternative for Summary Judgment, plaintiff's opposition [ECF No. 141], defendant's reply [ECF No. 142], and plaintiff's surreply [ECF No. 143]. Upon consideration of these motions, applicable law, and the record in this case, the Court will GRANT defendant's motion for summary judgment and DENY plaintiff's motion for partial summary judgment.

## I.    BACKGROUND

Ms. Kline is a federal employee working at the U.S. Office of Personnel Management (OPM). In 2002, she "was hired . . . as a GS-12 Management Analyst." Pl.'s Second Am. Compl.

¶ 13, ECF No. 123. She alleges she "was hired to perform regulatory work on a full-time basis for OPM's Publications Management Group (PMG) and act as the 'backup' to Jacqueline Carter." *Id.* ¶ 14.

In May 2003, Ms. Kline's Position Description (PD) was changed to include non-regulatory duties because there were not enough regulatory duties to support both her and Ms. Carter. *Id.* ¶¶ 19-20. Her new PD listed four major duties, only one of which mentioned regulatory work: Ms. Kline was to "Assist[] the Regulatory Team by performing activities related to Regulatory Issuance by providing editorial review and interpretation of policy." ECF No. 134-1 Ex. 4 ("Kline 2003 PD") at 2. These changes were the subject of a previous lawsuit brought by Ms. Kline, *Kline v. Springer*, 602 F. Supp. 2d 234 (D.D.C. 2009) *aff'd sub nom. Kline v. Berry*, 404 F. App'x 505 (D.C. Cir. 2010). On appeal, the D.C. Circuit affirmed the district court's grant of summary judgment to OPM, holding that most of the alleged injuries were not actionable under Title VII, that they did not result from illicit discrimination, and that OPM offered legitimate, non-discriminatory reasons for Ms. Kline's mediocre performance evaluation. *Kline v. Berry*, 404 F. App'x 505, 505 (D.C. Cir. 2010).

Nonetheless, Ms. Kline alleges that even after being reassigned, she "performed regulatory work, including review of the regulations for conformance with the Federal Register Office, Code of Federal Regulations (CFR), and Office of Management and Budget (OMB) requirements and for publishing regulatory issuances in the *Federal Register* and CFR." Second Am. Compl. ¶ 22. She alleges that she "performed Federal Register Office and Liaison duties" in addition to "some non-regulatory duties." *Id.* ¶¶ 23, 25.

On March 29, 2006, Ms. Kline's supervisors received an e-mail raising concerns that she was using her work computer inappropriately and was attempting to procure weapons and

ammunition from someone she knew online. *Id.* ¶ 27. On April 5, 2006, Ms. Kline's supervisor, Mr. William Davis, placed her on Administrative Leave pending an investigation by the Inspector General's Office (OIG) into these allegations. *Id.* ¶ 28. Ms. Kline was asked to surrender all government property in her possession, including a cell phone, a computer, and a badge. *Id.* ¶¶ 30, 33.

On April 19, 2006, Ms. Kline initiated an informal EEO action against OPM. *Id.* ¶ 34. Ms. Kline alleged she was discriminated against on the bases of her race (Caucasian) and sex (female), and in retaliation for prior EEO activity, when she was placed on Administrative Leave. Pl.'s EEO Complaint No. 2006024, ECF No. 132-1, Ex. 1.

Upon conclusion of the investigation, the OIG stated in its report that there was no evidence to support the allegations that Ms. Kline had attempted to procure weapons and ammunition, Second Am. Compl. ¶ 37, and she was cleared of wrongdoing, *id.* ¶ 39. The OIG investigation did, however, reveal that Ms. Kline "maintained and visited various websites utilizing government equipment during her work hours . . . In addition, Ms. Kline stated that she is only provided with (4) four hours' worth of work per week and thus she visited the internet." Defs.' Ex. 9, ECF No. 132-1.

On May 15, 2006, Ms. Kline filed a formal complaint of retaliation, and Ms. Kline's supervisors were contacted by the EEO investigators on or about May 23, 2006. Second Am. Compl. ¶¶ 42, 45.

On or about June 16, 2006, Mr. Davis asked Ms. Kline to return to work. *Id.* ¶ 46. She returned on June 20, 2006. *Id.* ¶ 47.

Ms. Kline alleges that on her first day back, she "met with Mr. Davis who told her that she was no longer going to be performing regulatory work or assisting Ms. Carter as she had done in

the past." *Id.* ¶ 48. In an apparent contradiction, Ms. Kline also alleges that "Mr. Davis also informed [Ms. Kline] that she would no longer be acting as Ms. Carter's "backup" but would only be performing regulatory work on an "as needed" basis." *Id.* ¶ 49. "Mr. Davis further informed [Ms. Kline] that Mr. Coco was now a Team Leader and would be responsible for assigning her regulatory work, if necessary." *Id.* ¶ 50. "Mr. Davis further informed [Ms. Kline] that she was not to send regulatory documents to the Federal Register Office under her signature and authority but that any regulatory issuances had to be sent under Mr. Coco's signature and authority if Ms. Carter was not available." *Id.* ¶ 55. Mr. Davis also informed her that she would be assisting Mr. Coco in an administrative capacity and be primarily responsible for answering the telephone and responding to emails sent to the Publications inbox. *Id.* ¶¶ 56-58. Indeed, Ms. Kline alleges that after she returned from Administrative Leave she was only assigned "routine, menial, administrative, and/or clerical duties"—she was not assigned any regulations to review or perform any liaison duties. *Id.* ¶¶ 59-61. Her previous equipment was not returned to her. *Id.* ¶¶ 63-65.

On June 20, 2006, Ms. Kline initiated another informal retaliation action based on the diminution of her duties. *Id.* ¶ 68. She filed a formal complaint alleging the same on August 9, 2006. *Id.* ¶ 69. The claims before the EEO were 1) "Was Complainant discriminated against on the bases of her race (Caucasian), sex (female), or in retaliation for prior EEO activity when, on June 20, 2006, her work assignments were changed from professional in nature to clerical;" and 2) "Was Complainant discriminated against in retaliation for prior EEO activity when, on June 20, 2006, she was denied the return of work equipment previously in her possession?" EEO Acceptance Letter, Defs.' Ex 2, ECF No. 134.

Ms. Kline also makes several allegations regarding the hiring of Mr. Stephen Hickman. In August 2006, PMG advertised a new, full-time Management Analyst position performing

regulatory work on USA JOBS. Second Am. Compl. ¶ 72. Ms. Kline alleges that this position's PD was virtually identical to her original PD. *Id.* ¶82. Ms. Kline alleges this position was not classified as a management position, and thus she did not apply for it. *Id.* ¶¶ 74-75, 77. Mr. Hickman was hired into this position in October 2006. *Id.* ¶¶ 77-79. Ms. Kline alleges that Mr. Hickman took over all of Mr. Coco's regulatory duties, virtually eliminating Ms. Kline's regulatory duties. *Id.* ¶¶ 83-87. This Court has previously ruled that "The reason Mr. Hickman was hired . . . is not relevant to Plaintiff's diminution of duties [claim] because, as Judge Robertson has previously ruled, Ms. Carter and [plaintiff] had different duties and were not similarly situated." *Kline v. Berry*, Civ. A. No. 10-1802(RWR)(AK), 2012 WL 1970868, at *8 (D.D.C. June 1, 2012).

Although Ms. Kline's attempts to sneak in additional claims and put forth irrelevant facts somewhat obfuscate the issue at hand, the *only* question before the Court in this case is whether OPM retaliated against Ms. Kline by diminishing her substantive regulatory duties after she returned from Administrative Leave on June 20, 2006. *See* Pls.' Second Am. Compl., ECF No. 123; Defs.' Mem. in Supp. Of Defs.' Mot. to Dismiss or, in the Alternative, Mot. for S.J. and Defs.' Opp'n to Pl.'s Mot. for Partial S.J. ("Defs.' Mot.") 14, ECF No. 132-1. This issue was squarely before the EEO and is the only claim alleged in Ms. Kline's Second Amended Complaint.

## II.    MOTION TO DISMISS

Although OPM has styled its motion as a motion to dismiss, or, in the alternative, for summary judgment, the Court will treat the motion to dismiss as a motion for judgment on the pleadings because OPM filed an answer to the complaint on June 30, 2011. Defs.' Answer, ECF No. 6; *see Langley v. Napolitano*, 677 F. Supp. 2d 261, 263 (D.D.C. 2010) ("[A]s the standards for review are the same under either Fed. R. Civ. P. 12(b) or 12(c), courts routinely treat motions to dismiss that are filed after a responsive pleading has been made as a motion for judgment on the

pleadings."); *see also Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999); *Joseph v. Patterson*, 795 F.2d 549, 563 (6th Cir. 1986). No prejudice to any party results from treating a Rule 12(b)(6) motion as a Rule 12(c) motion "because the standard of review for motions for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure is essentially the same as that for motions to dismiss under Rule 12(b)(6)." *Jung v. Ass'n of Am. Med. Colls.*, 339 F. Supp. 2d 26, 35-36 (D.D.C. 2004) *aff'd*, 184 F. App'x 9 (D.C. Cir. 2006).

On either motion, the Court may not rely on facts outside the pleadings and must construe the complaint in the light most favorable to the non-moving party. *See Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Granting judgment on the pleadings pursuant to Rule 12(c) or a motion to dismiss for failure to state a claim under Rule 12(b)(6) is warranted only if it appears beyond doubt, based on the allegations contained in the complaint, that "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957). *See also Alicke v. MCI Commc'ns Corp.*, 111 F.3d 909, 912 (D.C. Cir. 1997).

Accepting all facts pleaded as true, and viewing all inferences in a light most favorable to Ms. Kline, the Court finds that the complaint sets forth sufficient factual allegations to support her claim to relief. Accordingly, defendants' motion is denied.

## III.   SUMMARY JUDGMENT MOTIONS

### A. Summary Judgment Standard

Summary judgment should be granted when the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a)-(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 (1986). Factual assertions in the moving party's affidavits or declarations may be accepted as true unless the opposing party submits his own affidavits or declarations or documentary evidence to the contrary. *Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992).

### B. Title VII Analysis

Title VII makes it unlawful for an employer to retaliate against an employee for filing a charge of discrimination. *See* 42 U.S.C. § 2000e-3(a); *Borgo v. Goldin*, 204 F.3d 251, 255 n.5 (D.C. Cir. 2000). An act of retaliation gives rise to a separate cause of action under Title VII if it is of sufficient significance that it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe R.R. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted); *Rochon v. Gonzales*, 438 F.3d 1211, 1217-18 (D.C. Cir. 2006) (internal quotation marks omitted).

Title VII retaliation claims are analyzed under the familiar three-step framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as restated by the D.C. Circuit in *Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008), and *Jones v. Bernanke*, 557 F.3d 670 (D.C. Cir. 2009). To make out a prima facie case of retaliation, a plaintiff must show "(1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010) (quoting *Jones*, 557 F.3d at 677).

In *Brady*, the D.C. Circuit admonished that district courts should not pause to examine whether a plaintiff established a prima facie case when an employer offers a legitimate, non-discriminatory reason for its actions. "[W]here an employee has suffered an adverse employment

action and an employer has asserted a legitimate, non-discriminatory reason for the decision," . . .

whether the plaintiff has made out a prima facie case is no longer relevant. *Brady*, 520 F.3d at 494.

Rather, "a court reviewing summary judgment looks to whether a reasonable jury could infer

retaliation from all the evidence, which includes not only the prima facie case but also the evidence

the plaintiff offers to attack the employer's proffered explanation for its action and other evidence

of retaliation." *Gaujacq*, 601 F.3d at 577 (quoting *Jones,* 557 F.3d at 677) (internal quotation mark

omitted).

However, the D.C. Circuit has subsequently found that where the parties dispute whether

an adverse employment action has occurred, courts should first assess whether there is evidence

of an adverse action. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008); *see also*

*Beckham v. Nat'l R.R. Passenger Corp.*, 736 F. Supp. 2d 130, 149 (D.D.C. 2010). As in *Baloch*,

the parties in the instant suit dispute whether Ms. Kline suffered an adverse employment action.

The Court thus considers this issue first, because proceeding to a *Brady* analysis would be

premature.

In order to constitute an adverse action that is subject to redress under Title VII, an

employee must experience, due to her protected status, a "significant change in employment status,

such as hiring, firing, failing to promote, reassignment with significantly different responsibilities,

or a decision causing significant change in benefits." *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C.

Cir. 2003) (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)). The "reassignment of

job duties is not automatically actionable. Whether a particular reassignment is materially adverse

depends upon the circumstances of the particular case, and 'should be judged from the perspective

of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Burlington*

*N.*, 548 U.S. at 71 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. at 75, 81 (1998)).

"[M]ere idiosyncrasies of personal preference are not sufficient to state an injury. Purely subjective injuries, such as dissatisfaction with a reassignment, or public humiliation or loss of reputation, are not adverse actions." *Forkkio v. Powell*, 306 F.3d 1127, 1130–31 (D.C. Cir. 2002) (internal citations omitted). In sum, "[a]n employment action does not support a claim of discrimination unless it has 'materially adverse consequences affecting the terms, conditions, or privileges of [a plaintiff's] employment . . . such that a reasonable trier of fact could find objectively tangible harm." *Ginger v. District of Columbia*, 527 F.3d 1340, 1343 (D.C. Cir. 2008) (omission in original) (quoting *Forkkio*, 306 F.3d at 1131). Importantly, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington N.*, 548 U.S. at 68.

Ms. Kline's "diminution of duties claim is based on the stripping of her regulatory duties and only being assigned menial, clerical and/or administrative duties." Pl.'s Mem. in Supp. of the Opp'n to Defs.' Mot. to Dismiss or for S.J. ("Pl.'s Opp'n") at 6, ECF No. 141-1. Ms. Kline alleges that she was "constructively 'reassigned'" into a "'new' non-regulatory and unclassified position." *Id.* In support of this conclusion, she alleges that she was told by Mr. Davis that she would no longer be performing regulatory work "as she had done in the past" but would "be assisting Mr. Coco in an administrative capacity" because Ms. Carter no longer needed her assistance. *Id.* at 8. Instead, she would do regulatory work if it was assigned to her by the new (informal) "Team Leader," Mr. Coco. *Id.* at 9. She was told no longer to sign letters authorizing publication of regulations in the *Federal Register*, but that Mr. Coco would submit them under his signature and authority in the future. *Id.* Subsequently, Ms. Kline alleges, she was only assigned tasks appropriate for a secretary, and was not assigned "any substantive regulatory work like she had

done before she was placed on Administrative Leave." *Id.* Ms. Kline also alleges she was assigned "primary" responsibility for answering the PMG telephone and responding to Publications email, and otherwise asked to do "mundane clerical duties." *Id.* at 9-10.

Then, Ms. Kline alleges, after Mr. Hickman began working for PMG on October 17, 2006, Mr. Coco ceased being a regulatory "Team Leader" and "no longer assigned [her] <u>any</u> regulatory duties." *Id.* at 10.

PMG claims that this issue is both untimely and barred by res judicata because the change in her job responsibilities occurred in 2003, and Ms. Kline already litigated the issue—and lost— in court. *See* Defs.' Mot. at 18-19. Indeed, to the extent that Ms. Kline complains of specific clerical duties that are "demeaning and degrading," the record is clear that Ms. Kline has been tasked with these duties since before she was placed on Administrative Leave,[1] consistent with her PD change in 2003 and the business needs of the office. This Court has previously held as much. *See Kline v. Springer*, 602 F. Supp. 2d 234 (D.D.C. 2009) *aff'd sub nom. Kline v. Berry*, 404 F. App'x 505 (D.C. Cir. 2010).

Despite the fact that Ms. Kline's allegations indeed detail the specific tasks she was assigned, the Court recognizes her attempt to assert a new claim: Rather than alleging PMG violated the law by assigning her menial tasks, she alleges that they ceased assigning her *any*

---

[1] It is undisputed that when Ms. Kline returned from Leave, Mr. Davis assigned her the *primary* duty of answering the PMG phone line and responding to the publications inbox. Still, even though these duties were previously shared, they were always a part of Ms. Kline's job and taking over primary responsibility cannot alone establish "a significant change in employment status," especially because Ms. Kline concedes that she had a lot of free time at work. *See* Pl.'s Mem. in Support of Pl.'s Mot. for Partial S.J. (Pl.'s Mot. Partial S.J.) at 19 n.10, ECF No. 124-1 (Ms. Kline conceding that before going on Administrative leave, she was assigned only four hours of regulatory work per week and thus spent a lot of time completing personal tasks on the Internet).

substantive work. Still, Ms. Kline's allegations that her work assignments were significantly changed after her return from Administrative Leave are unsupported by the record.

Even before going on Administrative Leave, Ms. Kline did not have primary responsibility over any regulatory work. While Ms. Kline was initially hired as a GS-12 Management Analyst on the Regulatory Team of the in October 2002, her updated PD from 2003 was very different. In 2003, Ms. Kline was officially reassigned to a *different* position pursuant to a position review and reclassification, which was memorialized in the issuance of an SF-50 reassigning her to a different position. Declaration of Joseph J. Marcec ("Marcec Decl."), Defs.' Ex. 1 ¶ 10, ECF 142-1. Despite Ms. Kline's obstinate—and unsupported—insistence that her new position was still categorized as a regulatory position or gave her primary responsibility of regulatory duties, her updated PD clearly states that she was to perform mostly publications duties and "assist the Regulatory Team." Kline 2003 PD (emphasis added). As is consistent with the plain language of the PD, Joseph J. Marcec, Manager in the Staffing and Classification Group of OPM, testified that her duty to "assist" indicated that the work would only be assigned *as needed*. Marcec Decl. ¶ 10.

A comparison of the employees' PDs confirms that Ms. Kline's position was a general one with an assisting role in regulatory duties, while Ms. Carter and Mr. Hickman were both on the Regulatory Team and had significant duties in that area. Kline 2003 PD; Defs.' Ex. 14, ECF No. 134-1. Ms. Carter was a GS-13 Senior Regulatory Analyst on the Regulatory Team and had been in the PMG since 1989, and had primary responsibility for the regulatory issuances program in the PMG. Aff. of Jacqueline Carter, Defs.' Ex. 12 ("Carter Aff.") at 1-3, ECF No. 134-1. After Mr. Hickman was hired, he had primary responsibility of these regulatory issuances. Furthermore, Judge Robertson previously ruled that both Ms. Carter and Mr. Coco had a higher employment grade and different responsibilities than did Ms. Kline. *Kline v. Springer*, 602 F. Supp. 2d at 240.

While Mr. Coco was also a generalist, he was also a GS-13 senior Management Analyst who at one time was designated primary responsibility of regulatory issuances. *See* Defs.' Ex. O, Aff. of Robert Coco, ECF No. 124-4. In contrast, Ms. Kline was a GS-12 Management Analyst, whose PD stated that she would perform a variety of publications duties, and assist the Regulatory Team, *as needed*. Kline 2003 PD.

Mr. Davis alleges that he "never told Ms. Kline that she would be assisting Mr. Coco in an administrative capacity instead of assisting Mrs. Carter on Regulatory Issuances." *See* Defs.' Ex. 17, Aff. for William Davis ("Davis Aff.") at 3, ECF No. 134-2. He testified that Ms. Kline's PD stated that she was to assist both of PMG's senior Management Analysts: Ms. Carter on the Regulatory Team, and Mr. Coco in publications duties. *Id.* at 1. He further testified that since Ms. Kline had returned from Administrative Leave, her role concerning regulatory matters had not changed. *Id.* at 2. That is consistent with Ms. Carter's testimony that "[s]ince June 20, 2006 Ms. Kline's role regarding regulatory packages has not really changed. Mr. Coco is now the team leader, so if I need Ms. Kline to review a package, instead of assigning the package myself, I ask Mr. Coco to assign the package to her for review." *See* Carter Aff. at 2.

While the Court must take Ms. Kline's evidence as true at the summary judgment phase, Ms. Kline's own testimony and OPM's OIG Report undermine Ms. Kline's allegations about the scope of her regulatory work before her placement on Administrative Leave and demonstrate that her duties were not in fact diminished. Mr. Davis testified that one of the reasons he asked Ms. Kline to spend more time assisting in publications duties was because an OPM OIG investigator told him that Ms. Kline stated to the OIG that she had only four hours of work per week to perform. *See* Davis Aff. at 3-4. Her affidavit for her EEO complaint concerning her placement on Administrative Leave confirms that in the months before she was placed on Leave "there were

very few regulations" to process. Defs.' Ex. 18, Aff. of Valerie Kline ("Kline Aff.") at 5, ECF No. 134-2. Ms. Kline represented to this very Court in her motion for partial summary judgment that she performed little regulatory work in the months leading up to her placement on Administrative Leave: "Due to the relatively few regulations that were being issued by the Agency during the past couple of months, there was not that much regulatory work to perform, and, when asked how much regulatory work she performed during this time period, she responded by saying approximately 4 hours of work per week." Pl.'s Mot. Partial S.J. at 19 n.10. Ms. Kline also concedes that there was not an increase in regulatory work in the PMG after she returned from Administrative Leave on June 20, 2006. Pl.'s Statement of Undisputed Material Facts, ECF No. 124-5 at ¶ 22. Thus Ms. Kline herself admits that she did very little regulatory work *before* she went on Administrative Leave, and that there was not much regulatory work to be done after she *returned* from Administrative Leave. Even if she did suffer a diminution in duties, Ms. Kline's own testimony suggests it was minor and therefore could not have been a materially adverse consequence affecting the terms, conditions, or privileges of her employment. Although Ms. Kline continues to assert that her duties were transferred to Mr. Coco or Mr. Hickman, it is an inescapable fact that Ms. Kline was not performing significant regulatory work even *before* she went on Administrative Leave.

Ms. Kline also alleges that prior to going on Administrative Leave, she was responsible for the issuance of Notice and Postings ("N&P") announcements and could issue them independently. The PMG issues N&P announcements approximately four times per month via email and their purpose is to notify the public of published OPM regulations. *See* Davis Aff. at 2. However, Ms. Kline does not suggest why the inability to sign N&P announcements in her own name is a material change in her employment status, and the Court sees no reason this is more than a minor slight.

*See Broderick v. Donaldson*, 437 F.3d 1226, 1233-34 (D.C. Cir. 2006) (refusing to allow plaintiff to submit her briefs directly to a top supervisor did not result in "significantly different responsibilities").

Finally, the Court finds the hiring of Mr. Hickman irrelevant to the instant lawsuit. Ms. Kline's allegations that her regulatory duties were "stripped from her" once Mr. Hickman came on board, Pl.'s Opp'n 19, are unavailing. Mr. Hickman was hired to take over Ms. Carter's duties when she retired. As explained, Ms. Carter's job was very different from Ms. Kline's. Ms. Kline's job was—at best—to serve as Ms. Carter's "backup," *id.*, as she never had primary responsibility over regulatory duties. Ms. Kline's subjective belief that she should have been "promoted into Ms. Carter's position" is unsupported by the record: Nothing about her job description or any other evidence suggests this.[2] As Judge Kay previously explained, "none of [Ms. Kline's] claims assert that she was discriminated against in not getting the managerial job; rather her claims are based on a diminution of duties in her *current* job and being placed on administrative leave. Therefore, the reasons for Mr. Hickman being given the managerial job are not relevant . . . ." *Kline v. Berry*, Civ. A. No. 10-1802(RWR)(AK), 2012 WL 1970868, at *8 (D.D.C. June 1, 2012). Such claims are outside the scope of Ms. Kline's instant diminution of duties claim. Indeed, they form the basis of yet another lawsuit pending before this Court.

Drawing all reasonable inferences from the evidence in Ms. Kline's favor, we conclude a reasonable jury could not find that she suffered an adverse employment action upon her return from Administrative Leave and that a reasonable person would have been dissuaded from filing

---

[2] Ms. Kline's assertions that advertising and filling a GS-12 classified position to replace a GS-13 classified position was "an unlawful personnel practice" is outside the scope of this suit since the duties advertised in the new position were not hers to begin with. The Court also notes that her argument is particularly unavailing given her own claim that *she herself* was hired into a GS-12 position for the purpose of replacing Ms. Carter.

an EEO action. Accordingly, we find "a material dispute on the ultimate issue of retaliation,"
*Jones*, 557 F.3d at 678, and grant OPM's motion for summary judgment. Because Ms. Kline
suffered no adverse action that is subject to redress, her claim of retaliation based on disparate
treatment fails.

Furthermore, even if Ms. Kline *had* suffered an adverse employment action, it is clear from
the record that OPM has asserted a legitimate, non-discriminatory reason for any minor changes
in Ms. Kline's duties and a reasonable jury could not infer retaliation from all the evidence. As
Ms. Kline herself admits, there was very little regulatory work to do *before* she left for
Administrative Leave, and there was no increase in regulatory work when she returned. *See* Pl.'s
Mot. Partial S.J. at 19 n.10; Pl.'s Statement of Undisputed Material Facts, ECF No. 124-5 at ¶ 22.
Mr. Davis' testimony that she was assigned primary responsibility for previously shared tasks
because of the apparent work imbalance is rational. Mr. Davis testified that because Mr. Coco was
overwhelmed with work duties, he assigned Ms. Kline the primary duty of answering the PMG
phone line and responding to the Publications Inbox as a way to correct an imbalance in the
workload. *See* Davis Aff. at 3-4. Given Ms. Kline's own statements about her own workload, this
is imminently reasonable. Finally, Mr. Davis testified that *prior* to April 2006, Mr. Coco sent the
N&P emails, a change in the distribution process that Mr. Coco and Ms. Kline agreed to. *Id.* at 2.
He explained that the change was necessitated in order to add an additional layer of review with
the intention of eliminating errors in the PMG. *Id.*

While it is undisputed that Mr. Davis did state that "no one wants to deal with [Ms. Kline]
due to [her] EEO activity," ECF No. 124-1 at 19; Ex. 18, one stray remark—even when made by
a supervisor—is insufficient to create a triable issue of discrimination where it is unrelated to an
employment decision involving the plaintiff. *Perry v. Shinseki*, 783 F. Supp. 2d 125, 138 (D.D.C.

2011) (quotations omitted). This comment was not related to any employment decision—though indeed, the Court has already established that no employment decisions were made. Mr. Davis made this remark to Ms. Kline after she stated her belief that if she had been invited to Ms. Carter's retirement lunch it perhaps "would have contributed to improving my relationships within the office." Defs.' Ex. 20, Supp. Aff. of William Davis 18, ECF No. 134-2; Kline Aff. at 18. One stray remark outside of the context of employment decisions could not demonstrate that Ms. Kline's EEO activity was the "but-for" reason for any alleged reprisal. Nor can a comment that a manager wanted Ms. Kline "out of here" made over a year after her complaint was filed or the mischaracterized deposition testimony about Ms. Kline's negative interactions with others in the office.

PMG gave Ms. Kline more clerical duties because she herself admitted she did very little regulatory work even before her Administrative Leave. Therefore, although the Court holds that Ms. Kline did not suffer an adverse employment action upon her return from Administrative Leave, it further finds that and a reasonable jury could not infer retaliation from all the evidence. Ms. Kline's habit of filing complaints and bringing lawsuits each time she is unhappy with her job will not "immunize [her] from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington N.*, 548 U.S. at 68.

## IV.   CONCLUSION

For the aforementioned reasons, defendant's motion for summary judgment will be GRANTED. For the same reasons, plaintiff's motion for partial summary judgment is DENIED and her case is DISMISSED. A separate Order consistent with this Opinion shall issue on this date.

Signed April 14, 2015 by Royce C. Lamberth, United States District Judge.